UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SARGENT MANUFACTURING COMPANY, | : |
| | : |
|     Plaintiff, | : |
| | :     3:08-cv-408 (CFD) |
|     v. | : |
| | : |
| CAL-ROYAL PRODUCTS, INC. | : |
| | : |
|     Defendant. | : |

**RULING ON CLAIM CONSTRUCTION**

**I.    Introduction**

This case arises out of a patent dispute between the patent holder, Sargent Manufacturing Company, and the defendant, Cal-Royal Products, Inc., concerning Sargent's '870 patent for the "Reversible Mortise Lock." The parties have submitted claim construction statements, and a Markman hearing was held before the Court. For the reasons that follow, the Court adopts the following claim constructions.

**II.    Background**

On October 21, 1997, the '870 patent entitled "Reversible Mortise Lock" was issued by the United States Patent office to Thomas Pelletier, the inventor. Since that date, Sargent has been the owner of the patent by assignment.

A mortise lock is a lock that fits into a pocket (a "mortise") cut into a door. A reversible mortise lock is one that functions regardless of which way a door is hung on its hinges. If a door is re-hung so that it swings open from the right-hand side instead of from the left-hand side, with a reversible mortise lock, the lock need not be replaced when the door is re-hung in the new

position. Although Sargent was not the first to design reversible mortise locks, Sargent argues the novelty of the lock in the '870 patent is that the door handle operation can be reversed without disassembling the lock casing or removing any components.

The reversible mortise lock's casing has a front and back wall, and two sidewalls. The latch bolt, which extends into the door frame pocket when the door is shut, and retracts back into the lock when the handle is turned, moves in response to two spindle hubs. The spindle hubs rotate independently, one driven by a handle on the inside of the door, and the other driven by the handle on the outside of the door. The interfering member—a key feature of this lock—can be set to prevent the rotation of one or both spindle hubs, thus locking the handle (either the inside or outside handle) that corresponds to the blocked spindle hub. The interfering member can be set into three positions, interfering with the rotation of one, the other, or both spindle hubs, and is accessible through a small, rectangular opening on the bottom of the sidewalls of the lock. An instrument such as a screwdriver can be inserted into the opening to position the interfering member into any one of the three possible positions. External components such as screws need not be removed, and no internal components need to be replaced.

Cal-Royal argues that the patent's file history shows that the only distinction between the '870 patent and prior art is the third possible position of the interfering member—the position that would prevent the rotation of both spindle hubs, and therefore both handles. Cal-Royal points to a 1968 patent issued to John Foster (U.S. Patent No. 3,361,462) which allowed the handing of a mortise lock to be switched without disassembling the casing, and suggests the only difference between the Foster patent and the '870 patent is the possible third position of the interfering member.

Sargent filed this lawsuit on March 17, 2008, alleging locks made and sold by Cal-Royal infringe the '870 patent. Cal-Royal brings a counterclaim alleging the '870 patent is invalid.

### III. Applicable Law and Discussion

#### A. Applicable Law

To be valid, a patent must describe the "exact scope of an invention and its manufacture" to delineate what exact invention is owned by the patent holder and inform the public of what options remain. See Markman v. Westview Instruments, Inc., 517 U.S. 370, 373 (1996). Federal law requires that a patent application include: first, "a written description of the invention . . . in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the [invention]" and second, claims which "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. "[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271. "Victory in an infringement suit requires a finding that the patent claim covers the alleged infringer's product or process, which in turn necessitates a determination of what the words in the claim mean." Markman, 517 U.S. at 374 (quotation marks omitted).

There are two essential parts of a patent case: "construing the patent and determining whether infringement occurred." Markman, 517 U.S. at 384. Patent claims are construed by the Court as a question of law, while the question of infringement is a question of fact that should be determined by a jury. See id. "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Innova/Pure Water,

Inc. v. Safari Water Filtration Systems, Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004). In construing the claims made in a patent application, the Court will "look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). "A technical term used in a patent document is interpreted as having the meaning that it would be given by persons experienced in the field of the invention, unless it is apparent from the patent and the prosecution history that the inventor used the term with a different meaning." Hoechst Celanese Corp. v. BP Chems. Ltd., 78 F.3d 1575, 1578 (Fed. Cir. 1996). The resources for making the claim construction determination are the evidentiary record—the patent and its specific claims—as well as any prosecution history. See Vitronics, 90 F.3d at 1582.

### B. Claims Construction

#### 1. Claim 1

#### a. "casing"

Claim 1 describes "a casing having a front plate for confronting a doorframe and a pair of opposed sidewalls, the front plate having an opening." Sargent requests the following definition: "the casing is the housing of the mortise lock, and includes a front plate and opposed sidewalls." Cal-Royal argues the claim is clear on its face and no additional construction is necessary. The Court finds that Sargent's definition of the casing as the "housing of the mortise lock" provides clarification, and is supported by other sentences in Claim 1 that describe components of the lock as within the casing. Therefore, the Court construes the term "casing" to mean "the housing of the mortise lock having a front plate for confronting a doorframe and a pair of opposed sidewalls, the front plate having an opening."

### b. "spindle hub slots"

Sargent requests that "spindle hub slots" be defined as "narrow openings within each spindle hub having spaced apart, opposed edges for contacting an interfering member." Again, Cal-Royal argues no additional construction is necessary, and that the inclusion of the descriptor "narrow" adds a layer of ambiguity to the claim language. However, as Sargent points out, the definition of a "slot" is "a narrow opening; a groove or slit." The American Heritage College Dictionary (Houghton-Mifflin Company, 3rd ed. 2000). Therefore, the Court adopts Sargent's proposed construction and construes the phrase "spindle hub slots" to mean "narrow openings within each spindle hub having spaced apart, opposed edges for contacting an interfering member."

### c. "the interfering member"

Claim 1 describes "[a] reversible mortise lock comprising . . . an interfering member . . . having a portion thereof adapted for insertion into either or both of the spindle hub slots to prevent movement of one or both of the spindle hubs." '870 Patent, Col. 9, Lines 43–47. Sargent requests that the interfering member be defined as "a separate component inside the casing that, when inserted into a slot within a spindle hub, interferes with the spindle hub's rotation to prevent retraction of the latch bolt."

Cal-Royal opposes this construction for two reasons. First, Cal-Royal argues that the language "separate component inside the casing" creates more ambiguity than it resolves. The Court disagrees. Defining the interfering member as a "separate component" specifies the relationship of the interfering member to the other parts located within the casing. Cal-Royal also argues that "inside the casing" implies that the interfering member is *always* inside the

casing, when in fact the member protrudes slightly from the casing when it is rotated. While Sargent's proposed construction does not completely exclude the possibility of the member protruding from the casing, the claim's original language of "disposed within" the casing is broad enough to encompass all of the possible positions of the member without creating ambiguity about the general location of the member.

Therefore, the Court construes the interfering member as "a separate component disposed within the casing that, when inserted into a slot within a spindle hub, interferes with the spindle hub's rotation to prevent retraction of the latch bolt."

### d. "to prevent movement of one or both of the spindle hubs"

Sargent proposes that the phrase "to prevent movement of one or both of the spindle hubs" be construed to mean "to prevent rotation of one or both of the spindle hubs." Cal-Royal requests a more nuanced construction, arguing that the phrase means "to prevent movement of one or both of the spindle hubs in the direction that retracts the latch bolt." Both parties appear to agree that the spindle hubs's movement is rotational. An unencumbered object can typically move in multiple directions, but because of the construction of the lock, other objects restrict the movement of the spindle hubs. The sidewalls of the lock prevent the spindle hubs from moving side-to-side, and the spindles inserted through the hubs prevent movement up, down, forward or backward. Therefore, the only possible movement of the spindle hubs is rotational movement around the spindles. When the interfering member is inserted into the spindle hub slots to prevent movement of the spindle hubs, the movement that is prevented is a rotational movement.

Cal-Royal's proposed construction also states that the interfering member prevents rotation of the spindle hubs in the direction that retracts the latch bolt. Referring to figures 3C

and 3D, the specification notes that "each spindle hub 80 and 82 may be pivoted or rotated in the direction indicated by arrow 100 [indicating a clockwise direction]." Id., Col. 5, Lines 28-29. A spring assembly keeps the spindle hubs normally upright in the default position, but then if torque is applied (by turning the door handle), the spindle hubs rotate in a clockwise direction, retracting the latch bolt. Fig. 2; '870 Patent Col. 8, Lines 4–9. If the lock is set such that the interfering member prevents rotation of one or both of the spindle hubs, the interfering member "catches" one or both of the spindle hubs, and prevents the spindle hubs from rotating and retracting the latch bolt. See Id. Col. 6, Line 58–Col. 7, Line 2. Therefore, Cal-Royal argues, the only way the interfering member prevents movement of the spindle hubs is by preventing them from rotating in the direction that retracts the latch bolt.

In its opposition and reply briefs, Sargent contends that Cal-Royal's proposed construction would improperly limit the scope of claim 1, and that the correct construction should not make reference to the direction in which the spindle hubs are prevented from rotating. This is a change, however, from Sargent's original position in its opening brief. Sargent's original proposed construction stated that "the interfering member is a separate component inside the case that, when inserted into a slot within a spindle hub, interferes with the spindle hub's rotation to prevent retraction of the latch bolt." This is nearly identical to Cal-Royal's proposed construction. Other language in claim 1 also supports Cal-Royal's construction. Claim 1 describes "the latch bolt moving from the extended position to the retracted position in response to the pivotal movement of either hub." Col. 9, Lines 40–42. Since the latch bolt moves in response to pivotal movement of the spindle hubs, when the spindle hubs are prevented from rotating by the interfering member, the latch bolt is prevented from retracting.

Sargent also argues that Cal-Royal's construction is improper because it would import a limitation of the disclosed embodiment into broader claim language. As a matter of law, the preferred embodiment of an invention should not be read into the claims. See e.g., SuperGuide Corp. v. DireTV Enterprises, Inc., 358 F.3d 870, 875 (Fed. Cir. 2004) ("Though understanding the claim language may be aided by the explanations contained in the written description, it is important not to import into a claim limitations that are not part of the claim. For example, a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment."). Sargent argues that Cal-Royal's assertion that the interfering member prevents rotation of the spindle hubs in the direction that retracts the latch bolt improperly relies on the position of a spring assembly and bracket (labeled 152) described in the preferred embodiment. In the disclosed embodiment, bracket 152 abuts the spindle hubs and keeps the spindle hubs upright in the default position. Sargent argues since claim 1 contains no reference to the spring assembly, to implicitly rely on the position of bracket 152, as Cal-Royal's proposed construction would do, is to import into claim 1 a limitation from the preferred embodiment. The Court disagrees. As discussed above, claim 1 explicitly states the latch bolt "moves from the extended position to the retracted position in response to pivotal movement of either spindle hub." The language of claim 1, not the description of bracket 152 in the preferred embodiment, suggests that if the interfering member prevents rotation of the spindle hub, the rotation that is prevented is the rotation that retracts the latch bolt. Cal-Royal's proposed construction does not import a limitation from the specification into claim 1; it is supported by claim 1 itself.

For the reasons stated above, the Court construes the phrase "to prevent movement of one or both of the spindle hubs" to mean "to prevent rotation of one or both of the spindle hubs in the direction that retracts the latch bolt."

### e. "without disassembling the reversible mortise lock"

Claim 1 recites: "A reversible mortise lock comprising . . . an interfering member being accessible through an opening in the casing and pivotal without disassembling the reversible mortise lock." The parties dispute what constitutes "disassembling" the lock. Sargent argues that the phrase should be construed to mean "without having to remove one or more components of the reversible mortise lock, and without having to open the lock casing." By contrast, Cal-Royal contends that the phrase means "without opening the lock housing and removing or rearranging internal components." Both parties agree that disassembly involves opening the lock housing. The dispute, therefore, centers on whether the removal of *any* component constitutes disassembly, or whether only the removal of *internal* components constitutes disassembly (and by extension, that just the removal of an external component would not equal "disassembly").

The construction of this claim is in dispute because Cal-Royal contends that two prior patents, the Foster patent described above, and U.S. Patent No. 4,998,133 issued to Nan C. Shih in 1991, also allowed for the handing of a lock to be changed without disassembly. According to Cal-Royal, in the Shih patent, the lock may by switched by removing a screw, sliding a "blocking member" out of one opening, rotating it, sliding it into another opening, and replacing the screw. According to Cal-Royal, all this may be done without removing the lock from the door. Similarly, to switch the handing of a door in the Foster patent, a screw must be loosened and the interfering member rotated. In contrast to the Foster and Shih patents, with Sargent's Reversible

Mortise Lock, the handing of the lock can be switched by inserting a screwdriver into an opening in the sidewall of the lock, and using the screwdriver to change the position of the interfering member. No screws or other objects are removed in the process. Cal-Royal argues that neither the '870 nor the Foster and Shih patents require any disassembly of the lock casing. Sargent, however, characterizes the processes described in the Foster and Shih patents as "disassembly," since both involve the removal of a screw, and argues only its '870 patent allows the handing of a lock to be reversed without disassembly.

In support of its argument, Cal-Royal points to evidence that the word "disassembly" as used in the patent means the removal and rearrangement of several components at a time. Cal-Royal cites to sentences in the specification that describe how mortise locks were reversed in early patents. The specification states that before this current invention, locks were disassembled by rearranging components, and replacement components had to be installed. Cal-Royal argues that since this discussion of disassembly refers to components in the plural, the specification uses the term "disassembly" to mean the removal of multiple components, not just one screw. Id., Col. 1, Lines 37–46. In addition, Cal-Royal cites to the specification's description of the casing "within which lock components are enclosed." Id., Col. 3, Lines 62–64. Cal-Royal argues this sentence indicates that "components" are those items housed *within* the casing. Other items, such as screws, which are secured *into* the casing, cannot be components. Therefore, Cal-Royal concludes, disassembly only includes the rearrangement of multiple, internal components. Any process that involves the removal or replacement of a single screw is not "disassembly."

Cal-Royal's arguments are unconvincing. First, the fact that the specification at times uses the term "disassembly" in reference to plural components does not mean that the term

"disassembly" can never refer to the replacement of one, single component.  Second, the word "component" is defined as "a constituent element, as of a system."  The American Heritage College Dictionary (Houghton-Mifflin Company, 3rd ed. 2000)  Given this definition, a screw could be considered a component of the mortise lock, and to remove a screw would be to remove a component of the lock.  The patent makes no distinction between internal parts of the lock that are "components" and external parts of the lock that are not "components."  Finally, Cal-Royal's construction relies heavily on the specification's description of previous technology, whereas the specification clearly states it is an "object of the present invention to provide a new and improved mortise lock in which components need not be removed from the mortise lock in order to reverse the door knob operation." Id. Col. 1, Lines 50-54.  In this sentence, no distinction is made between internal and external components; it states this patent embodies a method in which *no* components need to be removed.

For the reasons stated above, the Court construes the phrase "without disassembling the reversible mortise lock" to mean "without having to remove one or more components of the reversible mortise lock, and without having to open the lock casing."

### 2. Claim 4

**"The reversible mortise lock where each of the opposed sidewalls has an opening aligned with the interfering member to allow the interfering member to be pivoted from outside the casing without disassembling the reversible mortise lock."**

The phrase "without disassembling the reversible mortise lock" in Claim 4 is construed the same way as the identical phrase in Claim 1.  See discussion above.

### 3. Claim 5

### a. "a retainer disposed within and attached to the casing"

Claim 5 describes "a retainer disposed within and attached to the casing." Sargent argues the phrase should be construed to mean "the retainer is a separate component that is inside and attached to the casing, and holds an interfering member." Cal-Royal argues that "retainer" should be defined as "something that holds the interfering member," but objects to Sargent's characterization of the retainer as a "separate component," and objects to Sargent's description of the retainer as inside the casing. The reason for Cal-Royal's objection to Sargent's description of the retainer as a "separate component" is unclear. Since the retainer is within and attached to the casing, it is not synonymous with or of a part of the casing, so it is clearly separate from the casing. Cal-Royal's objection to the description of the retainer as "inside" the casing also fails. In support of its argument that part of the retainer may be outside the casing, Cal-Royal points to Figure 3A, which depicts rectangular sections of the retainer (labeled 128) extending outward. However, Figure 3A depicts a cross section of the lock. It was deliberately drawn without one of the sidewalls depicted, in order to illustrate the internal parts of the lock. Figure 3A is therefore not a reliable depiction of the exact size or position of the retainer, and does not indicate that parts of the retainer are outside the casing. The plain meaning of "disposed within" is that the retainer is inside the casing. Therefore, Court adopts Sargent's proposed construction and construes the phrase "a retainer disposed within and attached to the casing" to mean "the retainer is a separate component that is inside and attached to the casing, and holds an interfering member."

### b. "the interfering member being pivotally attached to the retainer"

Sargent requests this phrase be construed to mean "the interfering member is attached to the retainer and pivots relative to the retainer." Cal-Royal suggests the phrase be construed to mean "the interfering member being held by the retainer so that its movement is limited but it is still free to rotate." The dispute is over the meaning of the phrase "pivotally attached." Sargent argues Cal-Royal's proposed construction limits the movement of the interfering member to just one degree of freedom—rotational movement—while the word "pivot" in Sargent's construction does not limit the movement of the interfering member to just rotational movement. The deposition testimony of Sargent's technical expert supports Cal-Royal's proposed construction. When asked about a definition of "pivotally attached," Dr. John Pratt testified that he understood the phrase to mean that some of the six degrees of freedom of movement would be restrained, but at least one of the rotational degrees would not be restrained. The specification also supports Cal-Royal's proposed construction, describing the interfering member as "pivotally positioned" between the sides of the retainer via a pivot pin. Id., Col 6, Lines 25–26. The plain meaning of this language suggests the interfering member rotates, or pivots, around the pin, but the sides of the retainer restrict the interfering member's other degrees of freedom of movement.

For the reasons stated above, the Court construes the phrase "the interfering member being pivotally attached to the retainer" to mean "the interfering member being held so that its movement is limited but it is still free to rotate."

### 4. Claim 6

**"the interfering member is substantially planar"**

Claim 6 states "the interfering member is substantially planar." Sargent suggests that "substantially planar" be construed to mean "predominantly flat, two-dimensional." Cal-Royal

proposes the phrase be construed to mean "the interfering member has a planar surface for the purpose of engaging the slots of the spindle hubs."

Cal-Royal argues that since the claim uses the qualifier "substantially," there may be parts of the interfering member that are not planar. The sections of the interfering member that must be planar, however, are those portions that fit into slots on the spindle hubs. Sargent contends the phrase "substantially planar" refers to the entire interfering member, not just a part. Cal-Royal's proposed construction is more specific than the terms of the patent itself. In using the phrase "substantially planar," the claim language does not specify which, if any, part of the interfering member may be something other than planar, or for what purpose the interfering member is substantially planar. Because the claim language does not limit the description "substantially planar" to only those parts of the interfering member that engage the slots of the spindle hubs, the Court adopts Sargent's proposed construction.

For the reasons stated above, the Court construes the phrase "the interfering member is substantially planar" to mean "the interfering member is a predominantly flat, two-dimensional component."

### 5. Claim 13

**"a retainer disposed within and movably attached to the casing, the interfering member being pivotally attached to the container"**

Except for the limitation that the retainer is "movably" attached to the case, this claim language is identical to the claim language discussed in claim 5 above, and the Court construes the language in the same way.

### 6. Claim 18

> **"the interfering member being pivotable to a first position corresponding to the first orientation of the latch bolt that allows only one of the hubs to pivot and to a second position corresponding to the second orientation of the latch bolt that allows only the other hub to pivot, the interfering member also being pivotal to a third position wherein the portion of the interfering member is positioned within both spindle hub slots to prevent pivotal movement of the hubs"**

Claim 18 has many of the same terms as claim 1. Those claims are construed in the same way as the identical phrases in claim 1. Claim 18 also includes the additional language above that defines the three orientations of the interfering member and corresponding orientations of the latch bolt. To the extent there is any dispute about the construction of claim 18, it appears to be the same dispute about the movement of the spindle hubs discussed in connection with claim 1. The Court construes claim 18 consistently with its construction of claim 1. Therefore, the Court construes the phrase in claim 18 "to prevent pivotal movement of the hubs" to mean "to prevent pivotal movement of the spindle hubs in the direction that retracts the latch bolt."

## IV. Conclusion

For the reasons set forth above, the claims of the patent shall be construed in accordance with this opinion.

SO ORDERED. Dated this 7th day of October 2011, at Hartford, Connecticut.

       /s/ Christopher F. Droney
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**