UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SARGENT MANUFACTURING CO., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:08-cv-408 (VLB) |
| CAL-ROYAL PRODUCTS, INC., | : | |
| Defendant. | : | |
| | : | |
| | : | February 24, 2012 |

MEMORANDUM OF DECISION DENYING DEFENDANT'S PARTIAL MOTION FOR
SUMMARY JUDGMENT AS TO LOST PROFITS [Dkt. #91] AND DEFENDANT'S PARTIAL
MOTION FOR SUMMARY JUDGMENT AS TO WILLFULNESS [Dkt. #98]

I.      Introduction and Background

Plaintiff, Sargent Manufacturing Co., hereinafter "Sargent," filed this suit for patent infringement against Cal-Royal Products, Inc., hereinafter "Cal-Royal," alleging that Cal-Royal has infringed its United States Patent No. 5,678,870 [ " '870 Patent"] entitled the "Reversible Mortise Lock." The Parties filed a Joint Stipulation of Infringement and Validity in which Cal-Royal stipulated that patent claims 1-8, 11, 13, 14, and 18 of Sargent's '870 Patent are infringed by the versions of Cal-Royal's M Series mortise locks sold at the time the suit was initiated in 2008. [Dkt. #140].  Accordingly, the parties consented to an inclusion, upon entry of final judgment, of a judgment of infringement of patent claims 1-8, 11, 13, 14, and 18 of the '870 by Defendant Cal-Royal and its 2008 M Series Locks, and a final judgment that the claims of the '870 Patent are not invalid.

Currently pending before the Court are two motions for summary judgment filed by Defendant Cal-Royal: (1) a motion for summary judgment as to Sargent's

1

claim for lost profits under 35 U.S.C. §284 [Dkt. #91]; and (2) a motion for summary judgment as to Sargent's Willfulness Claim seeking treble damages and attorney's fees and costs asserting that Cal-Royal's infringement was willful [Dkt. #98].

A hearing on both motions for summary judgment was held on Wednesday February 15th, 2012.

II.     Standard of Review

"Summary judgment should be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' [Fed.R.Civ.P. 56(a)]. The moving party bears the burden of proving that no factual issues exist. [*Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir.2010)]. 'In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought.' [*Id.,* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986))]. 'If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied.' [*Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir.2006) (internal quotation marks and citation omitted)]. In addition, '[a] party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the

motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.' [*Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at \*1 (D.Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09civ1341(VLB), 2011 WL 4396704 at \*6 (D. Conn. Sept. 21, 2011)].

III.    Discussion

A.  Motion for Summary Judgment as to Lost Profits

The amount of damages due to a patent holder on the basis of patent infringement is a question of fact for which the patent holder bears the burden of proof. *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 926 F.2d 1161, 1164, (Fed. Cir. 1991).  Determining the appropriate amount of damages to compensate a patent holder for infringement "is not an exact science, and the methodology of assessing and computing damages is committed to the sound discretion of the district court." *State Industries, Inc. v. Mor-Flo Industries, Inc.*, 883 F.2d 1573, 1577 (Fed. Cir. 1989) (citation omitted).

"To recover lost profits a patentee must produce evidence of 'a causal relation between the infringement and its loss of profits.' " *Rosco, Inc. v. Mirror Lite Co.*, 626 F.Supp.2d 319, 328 (E.D.N.Y. 2009) (quoting *Bic Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218 (Fed. Cir. 1993). Where the evidence presented by the patentee is insufficient to establish lost profits, a court must determine and award a reasonable royalty. *See 35 U.S.C. §284* (providing in

relevant part, that a court shall award the victim of infringement "no less than a reasonable royalty for the use made of the invention by the infringer, together with interests and costs as fixed by the court."). At a minimum, "the floor for a damage award is no less than a reasonable royalty." *State Industries*, 883 F.2d at 1577. (citation omitted).  If the patent holder is able to prove some amount of actual damages, the court may award damages representing actual damages to the extent they are proven, and a reasonable royalty for the remainder. *See Id.* (citing *TWM Mfg. Co. v. Dura Corp.*, 780 F.2d 895, 898 (Fed Cir. 1986).

   At dispute on summary judgment is Defendant Cal-Royal's assertion that Sargent cannot establish lost profits as a measure of damages.

   Sargent's damages expert, John Crawford articulated his opinion in his expert report that Sargent is entitled to lost profits on the basis that sales of Cal-Royal's infringing mortise lock diverted sales from Sargent, the '870 Patent owner. Sargent notes, in its Memorandum in Opposition to Summary Judgment as to Lost Profits, that it does not seek to recover lost profits for *all* of Cal-Royal's sales because Mr. Crawford determined that some of Cal-Royal's sales would have gone to Yale Commercial Locks and Hardware, a company licensed to manufacture mortise locks under Sargent's '870 Patent.  Relying on the  "Panduit Test" set forth in *Panduit Corp v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978), Crawford's expert report argues that Sargent is entitled to lost profits for the portion of the infringer Cal-Royal's sales for which Sargent can demonstrate "but-for" causation, and then reasonable royalties for any remaining infringing sales.

Cal-Royal argues that Sargent and Crawford's reliance on the Panduit test is misplaced, asserting that the reversible mortise lock market is a multi-player market, segmented substantially by price point,  requiring a lost profits analysis under the *Bic Leisure* test, set forth in *Bic Leisure Profits v. Windsurfing*, 1 F.3d 1214 (Fed. Cir. 1993). Cal-Royal asserts that under the *Bic Leisure* analysis of lost profits in a segmented market, Sargent cannot show that it would have received any of Cal-Royal's sales given the availability of multiple sources of reversible mortise locks at lower prices.

The standard for determining lost profits in a two party market is set by the four factor test of *Panduit*.  Under the *Panduit* test, in order to recover lost profits from an infringer, a patentee must prove: (1) demand for the patented product; (2) the absence of acceptable non-infringing substitutes; (3) sufficient manufacturing and marketing capability to exploit the demand; and (4) the amount of profit lost. *Panduit*, 575 F.2d at 1156.

In *Bic Leisure*, the Federal Circuit limited the applicability of the *Panduit* test, holding that the *Panduit* test "operates under an inherent assumption [ . . . ] that the patent owner and the infringer sell products sufficiently similar to compete against each other in the same market segment." *Bic Leisure*, 1 F.3d at 1218.  However, as the *Bic Leisure* court discussed, in the absence of this assumption, the driving force of the *Panduit* test, "*Panduit*'s first two factors do not meet the 'but for' test- a prerequisite for lost profits." *Id.* The first *Panduit* factor, requiring demand for the patented product, "presupposes that demand for the infringer's and patent owner's products is interchangeable," allowing

evidence of sales of the infringing product to demonstrate demand for the substantially similar patented product. *Id.* The second *Panduit* factor, absence of acceptable, non-infringing alternatives, relies on the same assumption of substantially similar products.  As the *Bic Leisure* court reasoned, "[t]o be acceptable to the infringer's customers in an elastic market, the alleged alternative 'must not have a disparately higher price than or possess characteristics significantly different from the patented product.'" *Id.* at 1219 (quoting *Kaufman Co. v. Lantech*, 926, F.2d 1136, 1142 (Fed. Cir. 1991)).

In *Bic Leisure*, the Federal Circuit reversed the district court's award of lost profits under the *Panduit* test, finding that due to significant manufacture, design, and price differences in the sailboard market, along with the presence of at least fourteen competitors, the assumption underlying the *Panduit* test was not appropriate and could not be used by the patent holder to establish 'but-for' causation. 1 F.3d at 1219.

Cal-Royal contends that the reversible mortise lock market is similar to the market for windsurfing boards in *Bic Leisure* for two reasons.

### 1.  Price Disparity

First, Cal-Royal argues that the reversible mortise locks offered for sale by Sargent and Cal-Royal are offered at very different price points, asserting that Sargent's patented product targets a "high-priced niche" and Cal-Royal's product targets the "bargain basement" customers. Accordingly, Cal-Royal argues that due to the significant price differences between Sargent and Cal-Royal's respective products, Sargent cannot rely on the *Panduit* test to establish that

'but-for' Cal-Royal's infringing product, those customers would have purchased Sargent's product.  However, the expert opinion procured by Cal-Royal to support its motion for summary judgment discusses the average selling prices per unit of Cal-Royal mortise locks and Sargent mortise locks, taken from the report prepared by Sargent's expert, Crawford, as follows:

|      | Sargent  | Cal-Royal | Difference |
|------|----------|-----------|------------|
| 2002 | $101.29  | $85.39    | $15.90     |
| 2003 | $104.70  | $82.54    | $22.16     |
| 2004 | $110.69  | $83.50    | $27.19     |
| 2005 | $116.24  | $86.82    | $29.42     |
| 2006 | $121.55  | $89.72    | $31.83     |
| 2007 | $133.02  | $90.29    | $42.73     |
| 2008 | $142.09  | $95.55    | $46.54     |

These price disparities contradict Cal-Royal's claim.

The divergence between average selling prices is far less than the divergence between the patent holder and the infringer in *Bic Leisure*. In *Bic Leisure*, the price disparity was far greater. Whereas BIC boards sold for $312 to $407, Windsurfing's boards sold for $571 to $670, "a difference of over $250 or about 60-80% above BIC's selling range. *Bic Leisure*, 1 F.3d at 1218.  The Federal Circuit held that this dramatic price disparity, along with evidence of differing manufacturing processes, board design, and marketing strategies, demonstrated

that the patent holder failed to demonstrate that but-for the sales of the infringing

sales, the patent holder would have received greater profits. *Id.*

Here, however, the price disparity is far less significant, even relying upon

the numbers submitted by Cal-Royal. Further, Crawford reports that both Sargent

and Cal-Royal sell mortise locks in a very similar price range. Specifically,

Crawford reports that:

- **In 2009, Sargent sold 1,739 reversible mortise locks at $94.89, representing 21.2% of the locks of that model sold during that period.**
- **In 2008, Sargent sold 3,450 reversible mortise locks at $96.40, representing 19.6% of the locks of that model sold during that period.**
  - **In the same period, Crawford notes that Cal-Royal reported its Average Annual Price for its infringing M-Series lock to be $95.55**
- **In 2007, Sargent sold 3,062 reversible mortise locks at $97.73, representing 16.1% of the locks of that model sold during that period.**
- **In 2006, Sargent sold 3,320 reversible mortise locks at $86.46, representing 16.2% of the locks of that model sold during that period.**
  - **Cal-Royal reported its Average Annual Price for its infringing M-Series lock during this period to be $89.72.**
- **In 2005, Sargent sold 3, 074 reversible mortise locks at $82.77, representing 18.6% of the locks of that model sold during that time period.**
- **In 2004, Sargent sold 3, 117 reversible mortise locks at $79.02, representing 17.9% of the locks of that model sold during that time period.**
  - **Cal-Royal reported its Average Annual Price of its infringing M-Series lock during this time period to be $83.50.**

Cal-Royal's expert, George Miller, argues that the prices are significantly

different.  For example, Miller's report states that "[u]sing 2006 as an example; in

round numbers a customer could buy a Sargent lock for about $120 or a Cal-

Royal lock for about $90 (a difference of $30 per lock). That means that a

customer could buy six Sargent locks for $720, or eight Cal-Royal locks for $720. [Dkt. #96, Ex. W, Report of George Miller, p. 6]. This reflects a price disparity of only 33.3%.

Moreover, the parties offer contradictory expert opinions. Sargent's expert, Crawford, contends that the prices are not substantially different so as to create a segmented market. Rather, Crawford reports that he examined the documents and information produced by the parties and identified approximately 100 customer names that appear on the business records of both Cal-Royal and Sargent. [Declaration of Crawford, p. 2].

The parties have presented directly contradictory expert evidence concerning the pricing and customer base of each party's reversible mortise lock creating a genuine issue of material fact as to market segmentation.

2.  Market Definition

Secondly, Cal-Royal argues that Sargent narrowly defines the market to include only Sargent, Yale, and Cal-Royal by focusing on a feature of Sargent's patent for which there is "infinitesimal" if any demand, namely the "dual-locking" capability. However, while Sargent cites the fact that only Sargent, Yale and Cal-Royal offered locks containing the patented feature, Cal-Royal offers minimal and unpersuasive evidence to support its contention that there is no market for the patented feature, citing the fact that sales of the lock represent only 0.23 or 0.32 percent of Sargent's total lock sales, but not the total number of patented locks sold. As shown by the price comparison cited above, Sargent sold thousands of the patented locks annually, evincing demand for the patented lock.

To refute the sales data offered by Sargent, Cal-Royal offers the testimony of a Cal-Royal customer, the owner of Don's Key & Lock, stating that he was unaware that the Cal-Royal M series locks could be set to lock on both sides, and that he thought dual-locking locks were illegal. [Dkt. #92, Ex. U, Dep. of Don Aish, 14:5-11].  However, the testimony of a single customer can hardly be used establish that a feature of the lock is wholly valueless in the reversible lock market.  Moreover, the customer also admitted that he was not aware that the Cal-Royal locks were field-reversible, meaning that the handing of the door could be easily modified on site without disassembling the lock. This easily reversible feature was included in the Court's Ruling on Claim Construction, whereupon the Court defined the phrase "without disassembling the reversible mortise lock" to mean "without having to remove one or more components of the reversible mortise lock, and without having to open the lock casing." [Dkt. #139, Ruling on Claim Construction, p. 11]. This Ruling relates to Claim 1, for which Cal-Royal has stipulated to infringement.

Additionally, Cal-Royal asserts that dual-locking field reversible locks would be a liability in the prison/asylum market, absent any evidence to substantiate this contention. Lastly, Cal-Royal offers the testimony of Sargent's expert, Crawford, stating that prisons and asylums would not value the reversibility of the dual-locking feature. [Dkt. #92, Ex. B, Dep. of Crawford, 72:1-10]. The evidence offered by Cal-Royal to support their contention that the dual-locking feature is wholly without value in the market is unpersuasive. The opinion of one customer is not representative of the entire market.  Further, Crawford's

statement relates only to prisons and asylums, one component of the broad lock market.

Building on this thinly supported premise, Cal-Royal asserts that Sargent's definition of the market, incorporating the capability of setting both hubs/handles to be non-rotatable in the field, such that only Cal-Royal, Sargent, and Yale are contenders in the market, is too narrow. Rather, pointing to the price disparity and the alleged valueless dual-locking feature, Cal-Royal argues that the market place is broad and segmented, as in *Bic Leisure*. Cal-Royal identifies several companies that sell products marketed as "easily reversible mortise locks," including:

- **Arrow:** "Minimal force is required to reverse handling"
- **Corbin Russwin:** "Patented Quick Reversible feature enables reversal of hands without disassembling the lock case (Patent #6,349,982)
- **Best:** "In addition to the ability to quickly change the lock handing . . ."
- **Schlage:** "Only two simple steps are required to change the hand of any L Series lock. Rotate the latch unit 180 degrees and change the latch screw position."
- **Stanley-Best:** "Reversible latch rotates 180 degrees for easy handing change without opening case"
- **PDQ:** "We've reengineered the way to change handing. No more removing the case and reversing numerous parts. With our simplified method, remove one screw and reverse the stainless steel latchbolt through the backplate. It's that easy."
- **TownSteel:** "Instructions for changing lock handling describe a process of simply removing a screw. If it is also necessary to change the handing of the latchbolt it describes a process consisting of removing a screw, pull out and turn a piece, and reinstall with the screw.

Relying on these descriptions, Cal-Royal asks the Court to grant summary judgment in its favor as to Sargent's lost profits claim on the basis that a broader segmented market exists and therefore Sargent cannot rely on *Panduit* to

establish lost profits, admitting that these locks do not have the patented component or another component having the same function.

Sargent relies on *Standard Havens Products Inc. v. Gencor Industries, Inc.*, 953 F.2d 1360 (Fed. Cir. 1991) for the proposition that the competing products relied upon by Cal-Royal as evidence of a broad market are not acceptable substitutes, and therefore are not a part of the same market. In *Standard Havens*, the Federal Circuit recognized that "a product on the market which lacks the advantages of the patented product can hardly be termed a substitute acceptable to the customer who wants those advantages." 953 F.2d at 1373. Accordingly, the *Standard Havens* Court held that "if purchasers are motivated to purchase because of particular features available only from the patented product, products without such features- even if otherwise competing in the marketplace- would not be acceptable noninfringing substitutes." *Id.*

Sargent's expert, Crawford, discussed at length in his expert report, his contention that only three companies, Sargent, Yale, and Cal-Royal offer an easily-reversible mortise lock.  Further, while the Defendant contends that there is no market for the easily-reversible mortise lock, Sargent introduced evidence to the contrary. According to Crawford, from 2002 through 2008, between 250,000 and 400,000 easily reversible mortise locks were sold each year. [Crawford report Figure 1, Total Annual Demand for Easily Reversible Mortise Locks, pp. 17-18]. During that seven year period a total of 2.3 million easily reversible mortise locks were sold, generating revenues in excess of $270,000. *Id.* at 18.  Moreover, the

fact that Sargent sold thousands of the patented locks annually suggests customers did seek the unique features of that lock.

Accordingly, there is a genuine issue of material fact relating to the question of market definition, and how many "acceptable non-infringing substitutes" exist.

Although Cal-Royal argues briefly that Cal-Royal's adoption and implementation of a non-infringing design provides further evidence of a non-infringing substitute, this argument is unpersuasive.  Cal-Royal relies on *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341 (Fed. Cir. 1999) to support its argument that alternative designs can be used to establish reasonable alternative products in the market. However, the Federal Circuit in *Grain Processing* expressly noted that an alternative design's status as an alleged substitute in the relevant market depends in part on when the alternative was available. 185 F.2d at 1355. The *Grain Processing* Court explained very clearly that:

> [T]he critical time period for determining availability of an alternative is the period of infringement for which the patent owner claims damages, *i.e.*, the 'accounting period.' Switching to a non-infringing substitute after the accounting period does not alone show availability of the noninfringing substitute during this critical time. When an alleged alternative is not on the market during the accounting period, a trial court may reasonably infer that it was not available as a noninfringing substitute at that time. The accused infringer then has the burden to overcome this inference by showing that the substitute was available during the accounting period. Mere speculation or conclusory assertions will not suffice to overcome the inference. After all, the infringer chose to produce the infringing , rather than noninfringing, product. Thus the trial court must proceed with caution

> in assessing proof of the availability of substitutes not actually sold during the period of infringement. Acceptable substitutes that the infringer proves were avialble during the accounting period can preclude or limit lots profits; substitutes only theoretically possible will not. *Id.* at 1353 (citations omitted).

Cal-Royal admits in its 56(a)(1) Statement of Undisputed Facts that a non-infringing redesign was not created until July 2008, and did not go into production until December 2008. [Dkt. #100, Def. Rule 56 Stmt., ¶¶2-3]. Accordingly, Cal-Royal has failed to show that a non-infringing redesign was available during the accounting period. *See Grain Processing*, 185 F.3d 1341 at 1353 (holding that "[w]hen an alleged alternative is not on the market during the accounting period, a trial court may reasonably infer that it was not available as a noninfringing substitute at that time.").

For the aforementioned reasons, genuine and material factual disputes exist regarding the price disparity between and market structure for easily reversible mortise locks. Accordingly, Cal-Royal's motion for summary judgment as to Sargent's claim of lost profits is DENIED.

### B.  Summary Judgment as to Willfulness

In addition to seeking damages stemming from the infringement, Sargent's complaint requested the Court to hold that Cal-Royal's infringement was willful, and that the case is exceptional, and to award Sargent treble damages pursuant to 35 U.S. §285.  Defendant Cal-Royal seeks a partial order of summary judgment in its favor on Sargent's willfulness claim to preclude Sargent from recovering enhanced damages or attorney's fees based upon the assertion that controlling precedent establishes that there can be no finding of willfulness absent proof that

the infringing party had actual notice of the patent prior to the commencement of the lawsuit.

Plaintiff argues that actual notice is not a prerequisite to willful infringement, and that partial summary judgment as to willfulness is inappropriate where, as Plaintiff posits, there remain genuine issues of material fact.

Knowledge is not an element of infringement, but rather is a factor to be considered in assessing damages. The plain language of 35 U.S.C. §284 provides that upon a finding of patent infringement, in addition to awarded damages to compensate for the infringement,  "the court may increase damages up to three times the amount found or assessed." 35 U.S.C. §284.  Additionally, 35 U.S.C. §285 provides that in exceptional cases, the court may award reasonable attorney fees to the prevailing party. 35 U.S.C. §285.

In the absence of any statutory guidance, the Federal Circuit has held that "an award of enhanced damages requires a showing of willful infringement." *In re Seagate Technology, LLC*, 497 F.3d 1360, 1368 (Fed. Cir. 2007) (citations omitted). However, "a finding of willfulness does not require an award of enhanced damages; it merely permits it." *Id.* (citations omitted). The question of whether the infringer acted willfully is a question of fact. *See i4i. Partnership v. Microsoft Corp.*, 598 F.3d 381, 858 (Fed. Cir. 2010) ("the question of whether Microsoft willfully infringed the '449 patent was submitted to the jury").

 In *In re Seagate*, the Federal Circuit addressed the standard for willful infringement, analyzing interpretations of the term "willfulness" in other areas of

civil law, including copyright infringement and determinations of the appropriateness of punitive damages. *Id.* 1370-71. Relying on these interpretations of the term "willfulness," the Federal Circuit in *In re Seagate* rejected the "affirmative duty of care" standard for willful infringement set forth in *Underwater Devices, Inc. v. Morrison-Knudsen Co., Inc.*, 717 F.2d 1380 (Fed. Cir. 1983), finding that the standard was inconsistent with the general understanding of "willfulness," as conduct beyond mere negligence. *Id.* at 1371 (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) ("The word 'willful' . . . is generally understood to refer to conduct that is not merely negligent.")). In place of the prior standard, the *In re Seagate* Court articulated a two-part objective recklessness standard, requiring: (1) objective recklessness, to be established by "clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent;" and (2) "if this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk . . . was either known or so obvious that it should have been known to the accused infringer." *Id.*

Upon a finding of willfulness, courts then evaluate a list of factors set forth in *Read Corp v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992) to decide whether to award enhanced damages. However, at this stage, Defendant Cal-Royal's partial motion for summary judgment seeks to prevent the question of whether or not Cal-Royal engaged in willful infringement from reaching a jury, arguing that because Cal-Royal did not have actual notice of Sargent's patent prior to the filing of this lawsuit. Accordingly, the question for the Court to consider in

**16**

evaluating this partial motion for summary judgment as to willfulness, is whether as Defendant Cal-Royal contends, actual notice is required to support a finding of willfulness, and the factual record presented by Plaintiff precludes any reasonable juror from finding that Cal-Royal had actual notice of Sargent's patent prior to the commencement of this lawsuit; or, alternatively, whether a material factual dispute exists regarding willfulness.

Defendant Cal-Royal's contention that actual notice is a prerequisite to a finding of willful infringement has been soundly rejected by the Federal Circuit in *In re Seagate*. In *In re Seagate* the Federal Circuit acknowledged and then expressly rejected the prior test for willful infringement, set forth in *Underwater Devices*, which relied on actual notice. 497 F.3d 1371. The *Underwater Devices* standard stated that "[w]here . . . a potential infringer has actual notice of another's patent rights, he has an affirmative duty to exercise a due care to determine whether or not he is infringing." *Underwater Devices*, 717 F.2d at 1389-90. The *In re Seagate* court found that this standard for willfulness did not comport with other Supreme Court precedent relating to willfulness, and therefore overruled the actual notice/affirmative duty of care standard of *Underwater Devices*, setting forth an objective test, the plain language of which indicates that actual notice is not a prerequisite to a finding of willful infringement. *In re Seagate*, 497 F.3d at 1370-71. The standard provides that:

> [T]o establish willful infringement, a patentee must show
> by clear and convincing evidence that the infringer
> acted despite an objectively high likelihood that its
> actions constituted infringement of a valid patent. [ . . . ]
> The state of mind of the accused infringer is not relevant
> to this objective inquiry. If this threshold objective

> standard is satisfied, the patentee must also
> demonstrate that this objectively-defined risk
> (determined by the record developed in the infringement
> proceeding) was either known or so obvious that it
> should have been known to the accused infringer. *Id.* at
> 1371.

The plain language of this standard indicates that the infringer need not have had actual notice, rather, the infringer must be shown to have either known of the *risk* of infringement, or the risk of infringement was *so obvious that it should have been known*. Accordingly, Defendant's reliance on the requirement of actual notice to establish willful infringement is simply unfounded.

The remaining question on summary judgment, therefore, is whether a finding of willfulness is improper as a matter of law on the factual record presented by Sargent, or, alternatively, if a material factual dispute exists regarding willfulness.

Cal-Royal next argues that *In re Seagate* distinguishes between allegations of pre-filing and post-filing willfulness, and requires that in order to seek damages for post-filing willfulness, a patent holder must first seek a preliminary injunction.  Cal-Royal asserts that because Sargent did not seek a preliminary injunction, Sargent may not, as a matter of law, be awarded enhanced damages based on allegations of post-filing willfulness.

Sargent argues that the relevant discussion in *In re Seagate* acknowledges that where pre-filing willfulness continues post-filing, a patent holder need not seek a preliminary injunction in order to obtain enhanced damages for willful infringement following a judgment on infringement. Moreover, Sargent argues that seeking an injunction in this case would have been futile, given that the

standard for granting an injunction requires a showing that the remedies available at law, including monetary damages, are inadequate to compensate for the injury, which is not the case in the present lawsuit.

In *In re Seagate*, the Federal Circuit distinguished between pre-filing and post-filing willful infringement as follows:

> "[A] willfulness claim asserted in the original complaint must necessarily be grounded exclusively in the accused infringer's pre-filing conduct. By contrast, when an accused infringer's post-filing conduct is reckless, a patentee can move for a preliminary injunction, which generally provides an adequate remedy for combating post-filing willful infringement. [ . . . ] A patentee who does not attempt to stop an accused infringer's activities in this manner should not be allowed to accrue enhanced damages based *solely* on the infringer's post-filing conduct. Similarly, if a patentee attempts to secure injunctive relief but fails, it is likely the infringement did not rise to the level of recklessness.  497 F.3d at 1374. (emphasis added)

This language seems to suggest that although a patentee may not neglect to seek an injunction and accrue enhanced damages based *solely* on post-filing conduct, the requirement of seeking an injunction in order to later obtain enhanced damages may not apply if the pre-filing conduct continues post-filing, such that the enhanced damages would be based on both pre and post-filing willfulness.

Moreover, the *In re Seagate* court recognized that "in some cases a patentee may be denied a preliminary injunction despite establishing a likelihood of success on the merits, such as when the remaining factors are considered and balanced. In that event, whether a willfulness claim based on conduct occurring solely after litigation began is sustainable will depend on the facts of each case." *In re Seagate*, 497 F.3d at 1374.  Sargent argues that seeking an injunction to

prevent Cal-Royal's willful infringement through the continued sale of its infringing mortise lock would have been futile, given that the standard for obtaining a permanent injunction as a patent holder, as set forth by the Supreme Court in *eBay v. MercExchange*, 547 U.S. 388 (2006) requires the patent holder to demonstrate that "the remedies available at law, such as monetary damages, are inadequate to compensate" for the injury. 547 U.S. at 391. Therefore, Sargent contends that genuine issues of material fact exist relating to both Cal-Royal's pre-filing and post-filing conduct.

### 1.  Pre-Filing Willfulness

Sargent argues that Cal-Royal had constructive notice that the Sargent mortise lock was protected by a patent given that Sargent complied with 35 U.S.C. §287(a) by marking its patented products. Defendant Cal-Royal does not dispute that Sargent marked its mortise locks, rather Cal-Royal asserts that actual notice is required to establish willfulness, which, as discussed above, is a misstatement of the plain language of the holding of *In re Seagate*. Moreover, Sargent asserts that Cal-Royal had constructive notice of Sargent's '870 patent given that Kaye Yashar, the Chief Executive Officer of Cal-Royal testified that he attended trade shows where Sargent locks were displayed. [Dkt #109, Ex. 5, Deposition of Kaye Yashar, p. 9].

Cal-Royal inexplicably relies upon its argument that actual notice is required, and argues that it did not have actual notice of the Sargent '870 patent, relying on Yashar's testimony that Cal-Royal was not aware that its mortise lock

could perform the dual-locking function, which Cal-Royal claims is the only infringing element of its mortise lock.

Accordingly, there is a genuine and material factual dispute as to constructive notice, a fact essential to the *In re Seagate* standard for willful infringement, requiring proof that the objectively high likelihood of infringement was either known, or so obvious that it should have been known.

### 2.  Post-Filing Willfulness

Sargent argues that three genuine issues of material fact remain relating to Cal-Royal's post-filing conduct, consisting of: 1) whether it was objectively reckless for Cal-Royal to continue to sell the accused product; (2) whether the opinion of Cal-Royal's counsel was incompetent; and (3) whether Cal-Royal unreasonably relied on this incompetent opinion of counsel for its post-filing sales.

### a.  Continuing to Sell the Accused Product

Kaye Yashar, Cal-Royal CEO openly admitted in his deposition taken on November 10, 2009, that Cal-Royal continues to sell the infringing design. He says that although he is selling mostly the new product, the 2008 redesign, "some of the ones we're selling are more of the very slow moving items that we have it in inventory that doesn't move a lot. But yes, we do sell." [Dkt. #109, Ex. 5, Dep. of Kaye Yashar, p. 44]. However, in a declaration dated February 4, 2011, Kaye Yashar states that "[A]t this point, Cal-Royal is only selling the redesigned mortise locks." [Dkt. #101, Ex. 5, Decl. of Kaye Yashar, ¶12]. Therefore, Cal-Royal has admitted that after Sargent filed the current lawsuit alleging infringement of

its '870 patent, Cal-Royal created a new design of its easily reversible mortise lock to avoid infringement, and yet continued to sell the allegedly infringing design until at least 2009. This fact alone would allow a reasonably jury to find that Cal-Royal's willfully infringed Sargent's '870 patent in the post-filing period.

b. Competency of and Reliance on the Opinion of Cal-Royal's Counsel

Sargent asserts that in June 2010 it became aware that Cal-Royal relied on a single opinion, written by George W. Hoover, for its position on infringement and validity. Cal-Royal does not dispute that this was the sole opinion relied upon as to non-validity and non-infringement. Sargent argues at length that this opinion is patently incompetent, as the assertions of invalidity and non-infringement were conclusory and offered no substantive basis in support of the assertions made.

Cal-Royal argues that they did not rely on the opinion, but rather conservatively elected to create a new, non-infringing design, and therefore reliance on the opinion cannot be used to substantiate a finding of willful infringement. However, given that Kaye Yashar, the CEO of Cal-Royal openly admits that Cal-Royal continued, through 2009, to sell the allegedly infringing product, it is apparent that Cal-Royal did, at least in part, rely on the Hoover opinion.

Accordingly, a genuine material factual dispute exists regarding Cal-Royal's post-filing conduct. A reasonable jury could find that Cal-Royal's continued sale of the allegedly infringing model following the filing of this lawsuit constitutes willful infringement. Further, the sufficiency of the Hoover opinion,

and whether or not Cal-Royal unreasonably relied upon it, constitute questions of fact for a jury to determine.

**IV.     Conclusion**

For the aforementioned reasons, Cal-Royal's motion for summary judgment as to willfulness, and its motion for summary judgment as to lost profits are both DENIED. Genuine questions of material fact remain regarding the composition of the easily reversible mortise lock market. Moreover, there are genuine issues of material fact remaining regarding Cal-Royal's pre and post-filing conduct such that a reasonable jury could find that Cal-Royal willfully infringed Sargent's '870 patent during both phases.

                                                            **IT IS SO ORDERED.**
                                                            _____/s/_____
                                                            **Hon. Vanessa L. Bryant**
                                                            **United States District Judge**


**Dated at Hartford, Connecticut: February 24, 2012**